# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
### FORT MYERS DIVISION

UNITED STATES OF AMERICA

-vs-                                           Case No.:  2:08-cr-108-FtM-99SPC

JOSE EMIGDIO FLORES

_____

## REPORT AND RECOMMENDATION

**TO THE UNITED STATES DISTRICT COURT**

_____This matter comes before the Court on Motion to Suppress Evidence and Statements of Defendant (Doc. #65) filed on September 14, 2008.  The Government's Response to Defendant's Motion to Suppress Evidence and Statements of Defendant and Incorporated Memorandum (Doc. # 71) was filed on September 26, 2008.  An evidentiary hearing on the Motion was set before the undersigned on October 21, 2008.

At the hearing, the Defendant was present with Court appointed counsel, Lee Hollander.  The Government was represented by Assistant United States Attorney Yolande Viacava.  The Government called Special Agent Michael Kopper, Task Force Agent Kelly Witt, Detective Jay Rodriguez, and Detective Rebecca Prince as witnesses and introduced three items of evidence.  The Defendant did not call any witnesses during the course of the hearing.

The Defendant moves the court to suppress the following evidence:  approximately 6.08 pounds of suspected crystal methamphetamine, all items seized from the Defendant's residence subsequent to the entry and search of his residence (namely mail), a Consent to Search Form signed by the Defendant, two cellular telephones seized from the possession of the Defendant subsequent

to his arrest, a motor vehicle registration for a 1991 Toyota pickup truck, a white plastic kitchen-sized bag which contained the crystal methamphetamine, a Motorola i425 Boost cellular telephone seized from the residence, and a Taurus Ultra Lite 38 Special Revolver found on the Defendant.  In addition, the Defendant moves to suppress any and all statements made by the Defendant to law enforcement officers subsequent to the entry into his residence.

The Defendant argues the Government should have gotten a warrant to search the residence and because the entry and search was illegal, any evidence recovered thereafter was the "fruit of the poisonous tree."  The Defendant further argues that although the Defendant was read his <u>Miranda</u> warnings, he should have been advised of his rights before law enforcement asked him *any* incriminating questions.

The Government counters that the Defendant provided his consent to search and signed the consent waiver form for law enforcement.  The Government further argues the Defendant was advised of his rights under <u>Miranda</u> and the Defendant agreed to cooperate and answer questions.  Therefore, the Motion to Suppress Evidence and Statements should be denied.

## <u>EVIDENCE AND TESTIMONY</u>

### <u>Special Agent Michael Kopper: (Tr.  4-120)</u>

_____Michael Kopper ("Spec. Agt. Kopper") is a Special Agent with the U.S. Drug Enforcement Administration (DEA) and has been working in that capacity for approximately 13 years. (Tr. 4:14-17).  He has received more than 800 hours of comprehensive training at the DEA academy in Quantico, Virginia, as it relates to drug trafficking, methods of manufacture, drug identification, undercover operations, confidential source management and related subjects.  (Tr. 5:1-8).

Spec. Agt. Kopper became involved in a narcotics investigation into Jose Flores in December of 2007. (Tr. 5:23-25, 6:1-8). A confidential source ("CS") identified the Defendant as a known cocaine trafficker in the Fort Myers, Florida area. (Tr. 6:3-5). Thereafter, the DEA as well as the Fort Myers Police Department ("FMPD") initiated an investigation into the Defendant and the City of Palms Auto dealership owned by the Defendant. (Tr. 6:6-9).

On January 16, 2008, there was a controlled meeting set up between the CS and the Defendant where they discussed the purchase by the CS from the Defendant and his source of supply approximately 30 kilos of cocaine. [1] (Tr. 6:22-25, 7:1-3). Despite the discussions, no cocaine was purchased as a result of that preliminary meeting.[2] (Tr. 7:13-16).

Subsequent to that meeting and over approximately an eight (8) month period of time, there were numerous meetings and telephone calls between the CS and the Defendant.[3] (Tr. 9:3-6). On at least ten occasions there were operations planned where the CS was to have purchased controlled substances from the Defendant, however, none of those transactions were completed due to supply problems or other issues.[4] (Tr. 9:20-25, 10:1). Most of the meetings between the CS and the

---

[1]The January 16, 2008 meeting was surveilled by DEA and recorded. (Tr. 8:11-13).

[2]During the meeting, the CS and the Defendant discussed that they were going to use the code word "cars" to mean kilos of cocaine. (Tr. 7:19-23). An audio recording was made of the meeting and an unofficial transcript produced. (Tr. 8:16-18).

[3]Recordings of these phone calls are contained on approximately 16 cassettes. There are approximately 12 CDs containing the audio record of the meetings between the CS and the Defendant and other targets of the investigation. Approximately 11 DVDs containing video surveillance of the meetings between the CS and the Defendant also exist. (Tr. 9:3-15).

[4]On February 13, 2008, there was coordination between the CS and the Defendant to purchase 30 kilos of cocaine which were in the Fort Myers area. (Tr. 11:4-12). Another controlled purchase was attempted for 15 kilos. (Tr. 11:18-20). There were also negotiations between the CS and the Defendant in regard to a deal to take place in Atlanta for 20 to 30 kilos. (Tr. 12:2-6). That

(continued...)

Defendant took place at either the residence of the CS, or at the City of Palms Automotive Dealership. (Tr. 13:1-5). Generally, the deals were to take place at the dealership. (Tr. 13:5). Although both an anticipatory search warrant and a search warrant were obtained, neither was executed. [5] Throughout the course of the investigation into the narcotics activity, the type and quantity of narcotics changed. (Tr. 19:2-16). [6]

On May 26, 2008, the Defendant introduced the CS to Gladys Arias Garcia ("Arias Garcia"). (Tr. 20:3-6). The CS met Arias Garcia, her brother, Nino Arias Garcia, and other associates at the dealership. (Tr. 20:10-23). Arias Garcia indicated she had 20 to 30 kilos of cocaine but only wanted to bring down eight (8) kilos from Atlanta since she was having problems with a driver and that the concealed compartment in the vehicle only held approximately 8 kilos of cocaine. (Tr. 21:4-10). They were going to come to the dealership and unload the vehicle there. [7] (Tr. 21:11-18).

---

[4](...continued)
deal fell through and another deal was set up for Fort Myers on or about April 18, 2008. (Tr. 14:6-11).

[5]On April 18, 2008, an anticipatory search warrant for the entire dealership was obtained. (Tr. 14:22-25). It was anticipated that there would be a controlled purchase of 20 kilos of cocaine at the City of Palms Automotive Dealership. (Tr. 15:3-5). Another search warrant was obtained which allowed entry into the Defendant's office. The task force spent the entire day into the evening waiting for the transaction to take place. (Tr. 15:18-23). The deal was postponed to the next day at which time law enforcement again set up surveillance. (Tr. 16:2-3). This same scenario repeated itself for the next several days where deals were set up between the CS and the Defendant, but transactions were never completed. (Tr. 16:2-22).

[6]Again on April 24, 2009 there was a transaction scheduled, however, that deal did not happen either. (Tr. 18:4-14). That particular transaction was set up for a location off Winkler Ave. and Fowler St. in Fort Myers.
There were at least six other occasions when deals were set up with the Defendant providing the information as to the location as well as the quantity of drugs that were available, yet none of the transactions occurred. (Tr. 18:18-25).

[7]In later conversations, Arias Garcia changed the transaction location to Atlanta because she
(continued...)

On July 24, 2008, the CS received a call from the Defendant indicating Arias Garcia had left Atlanta at 11:00 p.m. that evening and was in route to Fort Myers with six (6) pounds of crystal meth and that a meeting would take place in the morning on July 25, 2008.  (Tr. 27:22-25, 28:1-6, 29:8-14).  At 10:00 a.m. on July 25, the CS called Spec. Agt. Kopper and advised that the meeting was going to take place around noon-time.  (Tr. 28:17-21).  However, the meeting did not take place at noon.  (Tr. 28:22-23).

At approximately 1:00 p.m. Spec. Agt. Kopper and Task Force Officer Kelly Witt ("TFO Witt") established surveillance on the City of Palms Automotive Dealership.  (Tr. 28:25, 29:1-7).  At approximately 1:10 p.m., the CS called Spec. Agt. Kopper and advised that the Defendant and Arias Garcia and their associates were having lunch together and would meet later.  (Tr. 29:12-15).  At approximately 2:10 p.m., the CS called and indicated that lunch was over and the Defendant and Arias Garcia would be back at the dealership in 30 minutes. (Tr. 29:15-17, 30:3-9).

Around 2:40 p.m., the CS called Spec. Agt. Kopper and advised that the Defendant and Arias Garcia were back at the dealership but were not satisfied with the privacy there, and did not want to remove the drugs from the compartment in the vehicle. (Tr. 30:3-16).  They were going to look for another location with a garage.   (Tr. 32:25).

The CS arrived at the dealership at approximately 3:23 p.m. (Tr. 31:23-24).  The Defendant suggested using the garage at his residence located in Fort Myers Shores.  (Tr. 33:1-2).  He provided directions to the CS at that time.   While TFO Witt waited at the dealership, Spec. Agt. Kopper drove by the residence to look at it and then established surveillance in an area off  State Road 80 ("SR

---

[7](...continued)
was having problems with the cocaine.   However, she said she could supply crystal methamphetamine (crystal meth). (Tr. 23:6-12).

80"). [8] (Tr. 74:23-25).   At approximately 4:01 p.m., a blue van followed by a  gold Jeep Grand Cherokee with Georgia plates left the City of Palms Auto Dealership.[9] (Tr. 32:15-18).   TFO Kelly Witt followed the vehicles from the dealership to the Defendant's residence.  They arrived at the Defendant's residence at approximately 4:25 p.m. (Tr. 78:17-18).

After the vehicles arrived at the Defendant's residence, the gold Jeep Cherokee started heading westbound on SR 80 traveling  away from the residence.  (Tr. 35:6-9).   The agents suspected that they may have been compromised since TFO Witt had followed the vehicles all the way from the dealership to the residence.  (Tr. 35:9-10).  The vehicle then went southbound on I-75. (Tr. 36:11-12).  Spec. Agt. Kopper broke off surveillance at that time speculating the individuals in the gold Jeep may be  conducting counter-surveillance.  (Tr. 36:13-15).  The vehicle returned to the Defendant's residence between 4:45 p.m. and 5:00 p.m. (Tr. 36:15-19).

While waiting for the vehicle to return, Spec. Agt. Kopper was updating information on his laptop computer for a possible search warrant.  During the course of the investigation, Spec. Agt. Kopper had prepared at least 10 draft affidavits for search warrants.  He continued to update information as it came in.  (Tr. 83:2-5, 13-17).

Shortly thereafter, a silver 1991 Toyota pickup truck arrived at the residence. (Tr. 39:22-23). At approximately 5:30 p.m., the CS called to advise Spec. Agt. Kopper that the vehicle was in the garage and supposedly the drugs were in the vehicle.  (Tr. 41:8-14).  However, the CS told Spec.

---

[8]Spec. Agt. Kopper established surveillance two blocks away from the residence off SR 80. He was unable to see the residence from where he was located but did intermittent drive-byes over a period of 30 minutes or so.  (Tr. 75:19-22). This was the first time that Spec. Agt. Kopper had been to the residence since the transactions were to have taken place at the dealership. (Tr. 76:3-5).

[9]The CS, the Defendant and Arturo Perez, a/k/a Chavo were in the blue van followed by three people in the Jeep Cherokee. (Tr. 77:21-23).

Agt. Kopper that Arias Garcia said she would not remove the drugs from the concealed compartment until she saw the money.  (Tr. 41:4-7).  Spec. Agt. Kopper informed the CS that was not "good enough"; the CS needed to see the drugs.(Tr. 42:1-25, 43:1-4). [10]

It had been established between the CS and Spec. Agt. Kopper that once the CS viewed the drugs, he/she would verify that it was crystal meth, how much it was, then call a female courier who would be nearby, and the money would be delivered.  They were not going to bring the money until the CS verified the drugs were actually there. (Tr. 41:20-25, 42:1-5).  The CS told the Defendant the money was nearby and the minute he verified the drugs were there, he would place a call and the money would arrive immediately, they would verify the amount, and they would do the exchange quickly. (43:10-17).

Spec. Agt. Kopper continued to advise the CS about the necessity to see the drugs. (Tr. 41:20-25, 42:1-25, 43:1-9).  Just knowing that the vehicle was in the garage and they said there were drugs in it was not enough. (Tr. 43:1-25, 44:1-19).  They had been led to believe in other transactions that the drugs were physically on the premises, yet they never materialized. (Tr. 44:17-19).  The CS called to say he was waiting outside with a friend for the money van and when the money van got there, they would open up the garage for it to drive in. (Tr. 43:4-17).  After three (3) or four (4) additional phone calls, at approximately 6:30 p.m. - 6:38 p.m.,  the CS confirmed that he/she had seen the drugs. (Tr. 42:19-25, 43:1-25, 44:1-3, 20-24).

Within minutes of receiving the phone call, officers from FMPD, Florida Highway Patrol and DEA, secured the residence and the subjects. (Tr. 44:25, 45:1-21).  The residence was secured at

---

[10]The CS kept up contact with Spec. Agt. Kopper under the ruse that Spec. Agt. Kopper was acting as his compadre, his associate or godfather, up in the northeast - the person who was actually going to purchase the drugs. (Tr. 37:4-6).

6:43 p.m. by eight (8) to 12 officers. (Tr. 44:20-21, 46:14-22).  The officers knew there were approximately six (6) or seven (7) people at the residence at the time of the transaction. (Tr. 47:3-8). There were approximately 17 officers involved in the operation. (Tr. 88:3-10).

When  Spec. Agt.  Kopper approached the residence, he saw the CS, Arias Garcia, Xavier Medina San Toyo, and Arturo Perez Medina, a/k/a/ Chavo in front of the residence. (Tr. 47:9-24). He heard noises in the back like there were people running from the house. (Tr. 48:2-10). Eventually, at least two (2) individuals, including the Defendant, were apprehended in adjacent yards. (Tr. 48: 2-25, 49:1-11).

Spec. Agt. Kopper then turned his attention to doing a protective sweep of the residence. (Tr. 49:17-22).  The protective sweep lasted several minutes in order to clear the house. (Tr. 50:17- 20). He then began to clear the garage area which had  limited light. (Tr. 49:23-25, 51: 1-2, 14-25, 52:1-5).  He opened the garage door and began to sweep the area behind the silver pickup truck. (Tr. 51:8-10).  He also cleared the cab to verify there was nobody hiding inside. (Tr. 51:12-16).  When he looked through the window of the pickup using a flashlight, he noted the dashboard had been disassembled. (Tr. 51:14-24).  He walked around the vehicle to clear the other side. (Tr. 52:23-25, 53:1-2).  He cleared the bed of the vehicle and noted a white plastic kitchen bag which contained what he believed to be crystal meth. (Tr. 53:11-17).  The bag was open and oriented towards the side of the right rear quarter panel. (Tr. 53:17-23).  He also cleared the attic in the garage. (Tr. 53:24-25, 54:1).  He spoke with the CS who told him the drugs were in the back of the pickup truck in a plastic bag. (Tr. 53:1-6).

Spec. Agt. Kopper  made contact with the Defendant and asked him if he was the owner of the residence.  (Tr. 53: 24-25, 54:1-6).  The Defendant indicated that he was. (Tr. 54:3-6).  Spec.

Agt. Kopper asked the Defendant if he had anything that he could show him that could prove that. (Tr. 54:6-8).  The Defendant took Spec. Agt. Kopper into the house, through the garage to the kitchen, opened a kitchen drawer, and showed him mail that had his name on it.. (Tr. 54:8-12).  At that time, Spec. Agt. Kopper  asked the Defendant for consent to search the residence.[11] (Tr. 54: 20-24).  The Defendant said, "go ahead and search." (Tr. 54: 20-24).  He provided the Defendant with a consent to search form and asked him whether he would prefer it in English or Spanish. (Tr. 54:25, 55:1-7).  The Defendant indicated Spanish. (Tr. 55:7-8).[12]  The Defendant read over the form and signed it at 7:15 p.m. (Tr. 56:13-19, 59:4-6).

After obtaining consent to search, Spec. Agt. Kopper seized  what was later confirmed to be six (6) pounds of crystal meth in the bed of the 1991 silver pick-up truck. (Tr. 59:13-22).  No other drugs were located at the residence. (Tr. 59:13-22).  Spec. Agt. Kopper was also given a loaded firearm that was found on the Defendant at the time of his arrest. (Tr. 65:9-25, 66:1-2).

After the Defendant was brought into an interview room at FMPD, Spec. Agt. Kopper explained the case against him. (Tr. 107:20-25).  He indicated to the Defendant that they had been watching him for a very long time, they would prefer his cooperation, and would bring that cooperation to the attention of the courts. (Tr. 107:20-25, 108:1-2).

The Defendant was advised of his Miranda rights and was supplied with DEA Form 13, a waiver of rights form. (Tr. 66:9-18; 108:1-5).  The form was provided to him in Spanish. (Tr. 67:4-9).  He read and reviewed it, Det. Arturo Gonzalez reviewed each line with him,  made sure he

---

[11]The Defendant was not advised that he had a right to refuse consent to search the residence. (Tr. 103:18-21).

[12]Although he requested the Spanish form, the Defendant had been speaking to Spec. Agt. Kopper in English. (Tr. 55:10-23).

understood, and he initialed each line. (Tr. 67:10-16).  The Defendant signed the form in Spec. Agt. Kopper's presence. (Tr. 67:17-20).  At no time did the Defendant indicate that he did not wish to speak with them or that he wanted an attorney present. (Tr. 70:24-25, 110:4-9).  This interview took place at the Fort Myers Police Department at approximately 2:15 a.m. after the scene had been secured and searched, and the defendants had been processed and interviewed. (Tr. 105:1-7, 17-21).

The Defendant told Spec. Agt. Kopper that Arias Garcia had come from Atlanta, that she was the source of the six (6) pounds of crystal meth, and that the price was $23,000 per pound.(Tr. 68:13-19).  He confirmed they had met earlier on in the day at his dealership and that they had lunch together. (Tr. 68:13-24).   They agreed to do the deal at his residence in the garage.(Tr. 69:1-4).  He said they were waiting for the money van when the officers arrived. (Tr. 69:9-13).

**Task Force Officer Kelly Witt (Tr. 122-136)**

Kelly Witt has been employed with FMPD for the past 13 years. (Tr. 122:21-25).  He is currently assigned as a task force agent to the DEA and has been working in that capacity for almost two (2) years. (Tr. 123:1-6).

On July 25, 2008, he was assisting Spec. Agt. Kopper with an investigation involving the Defendant.(Tr. 123:7-20).  On April 18, 2008, TFO Witt served as the affiant on an anticipatory search warrant as well as a search warrant while Spec. Agt. Kopper was in Atlanta working on another aspect of the investigation.  Both the search warrant and the anticipatory search warrant were for the City of Palms Auto Dealership at 3445 Palm Beach Boulevard in Fort Myers.

On July 25, 2008, TFO Witt was assigned to help with surveillance at the dealership and was involved in securing the residence. (Tr. 125: 18-25, 126:1-2).  When he approached the residence,

he saw three (3) individuals outside the house. (Tr. 126:18-24).  He entered the house to perform a protective sweep, and went from room to room looking for people in the house. (Tr. 128:1-12).

## Detective Jay Rodriguez: (Tr. 137-146)

Detective Jay Rodriguez ("Detective Rodriguez") has been employed with FMPD for the past 10 years.  (Tr. 137:4-9).  On July 25, 2008, he was involved in assisting the DEA with an investigation into the Defendant and was in charge of the team that secured the rear perimeter of the house.  (Tr. 137:20-23).  At the time when law enforcement was approaching the front of the residence, he saw a Hispanic male later identified as the Defendant run from the back of the house towards the back yard. (Tr. 139:2-8).  Although Det. Rodriguez gave specific orders in Spanish and English for the Defendant to stop, he continued to run.  (Tr. 138:10-12). There was another Hispanic male who also came out of the rear of the residence and another from the side of the residence. (Tr. 138:13-16).   He proceeded after the two Hispanic males who came out second and third and let Detectives Derrig and Prince secure the Defendant.  (Tr. 138:16-20).  He had been on standby since earlier that day and was getting regular updates on the case.  (Tr. 142:17-25, 143:1-4).

## Detective Rebecca Prince (Tr. 147-153).

Detective Rebecca Prince ("Det. Prince") has been employed with FMPD  for the past 10 years and is currently assigned to a special investigations group.  (Tr. 147:8-15).  On July 25, 2008, she was involved in an investigation of the Defendant.  (Tr. 147:23-25).  She was there as backup to secure the rear of the residence.  (Tr. 148:4-11).  At the time that law enforcement approached the front of the residence, she observed the Defendant come through the fence from the back yard of the residence and run westbound between two (2) fence lines.  (Tr. 149:9-16). She drew her service weapon and directed the Defendant to get on the ground.  (Tr. 149:20-23).  He complied.  (Tr.

149:23).   While Detective Derrig secured the left wrist of the Defendant, he said "I got a gun, I got a gun in my boot." (Tr. 150:6-11).  The Defendant started to reach back towards his cowboy boot. (Tr. 153:7-10).  Det. Prince reached down and secured the loaded weapon.  (Tr. 150:10-17).

## DISCUSSION

The Defendant argues: (1) the warrantless search of the 5th Street residence was illegal and violated his Fourth Amendment rights; (2) the subsequent consent to search was tainted by the temporal proximity to the discovery of the crystal meth by the agents during their warrantless search; and (3) the Defendant's statements prior to his arrest and after he was read his Miranda rights at FMPD should be suppressed as involuntary or tainted by the proximity to the illegal search and discovery of the crystal meth.

The Government responds that there were sufficient exigent circumstances as well as probable cause to overcome the prohibition against a warrantless search.   In regards to the Defendant's statements, the Government argues the original statements were given in response to general routine questioning and that any subsequent statements were given after Miranda warnings were read and, therefore, should be admitted.

The initial inquiry is whether agents could, absent a search warrant, lawfully enter the Defendant's residence to search for and seize the crystal meth.  If so, the voluntariness of Flores' consent to search is immaterial - no consent would be needed.  If the agents could not lawfully enter the residence and search for the crystal meth, then Flores' consent to search becomes important.  At that juncture, the Court would then need to determine whether Flores' consent to the search of his residence, even if voluntary, was tainted by the illegality of the search, and therefore, rendered invalid.

<u>*(1) Whether Sufficient Exigent Circumstances Existed to Justify the Warrantless Search*</u>

"It is a 'basic principle of Fourth Amendment law' that searches and seizures inside a home without a warrant are presumptively unreasonable." <u>U.S. v Santa</u>, 236 F. 3d 662, 668 (11th Cir. 2000) (citing <u>Payton v. New York</u>, 445 U.S. 573, 586, 100 S.Ct. 1371, 1380, 63 L. Ed.2d 639 (1980)). "A warrantless search is allowed, however, where both probable cause and exigent circumstances exist." <u>United States v. Tobin</u>, 923 F.2d 1506, 1510 (11th Cir. 1991) *cert. denied,* 502 U.S. 907, 112 S. Ct. 299, 116 L. Ed. 2d 243 (1991) (holding to justify a warrantless entry into a house there must exist exigent circumstances in addition to probable cause). The Defendant is not disputing that the law enforcement officers had probable cause to believe that six (6) pounds of crystal meth was present in the garage of his house. However, the Defendant argues the agents did not have the exigent circumstances necessary to justify the search and seizure without first obtaining a warrant..

Although "[c]ourts have catalogued several situations in which exigent circumstances exist, ... it is clear that the exception must be applied carefully to each factual scenario." <u>Santa</u>, 236 F. 3d at 669 (citing <u>U.S. v. Lynch</u>, 934 F.2d 1226, 1232 (11th Cir.1991)). "The general requirement that a search warrant be obtained is not lightly to be dispensed with, and 'the burden is on those seeking [an] exemption [from the requirement] to show the need for it ....' " <u>Santa</u>, 236 F. 3d at 669 (quoting <u>Chimel v. California</u>, 395 U.S. 752, 762, 89 S.Ct. 2034, 2039, 23 L.Ed.2d 685 (1969) (alterations and omissions in original) (quoting <u>United States v. Jeffers</u>, 342 U.S. 48, 51, 72 S.Ct. 93, 95, 96 L.Ed. 59 (1951)). The exigency exception only applies when "the inevitable delay incident to obtaining a warrant must give way to an urgent need for immediate action." <u>Santa</u>, 236 F. 3d at 669 Recognized situations in which exigent circumstances exist include: "danger of flight or escape;

danger of harm to police officers or the general public; risk of loss, destruction, removal, or concealment of evidence; and 'hot pursuit' of a fleeing suspect." Id. (citing U.S. v. Blasco, 702 F.2d 1315, 1325 (11th Cir. 1983)); See United States v. Standridge, 810 F.2d 1034, 1037 (11th Cir. 1987) cert. denied, 481 U.S. 1072, 107 S. Ct. 2468, 95 L. Ed. 2d 877 (1987) (defining several factors which would indicate the existence of exigent circumstances including: (a) the gravity or violent nature of the offense with which the suspect is to be charged; (b) a reasonable belief that the suspect is armed; (c) probable cause to believe that the suspect committed the crime; (d) strong reason to believe that the suspect is in the premises being entered; (e) a likelihood that delay could cause the escape of the suspect or the destruction of essential evidence, or jeopardize the safety of officers or the public). Exigent circumstances will not justify a warrantless entry if the exigency was created by those conducting the search.  Santa, 236 F. 3d at 669; Tobin, 923 F.2d at 1510. For example, a warrantless search is not justified when police have probable cause and sufficient time to obtain a warrant but create an exigency to avoid the warrant requirement. Santa, 236 F. 3d at 669.

The Defendant is not disputing that the law enforcement officers had probable cause to believe that six (6) pounds of crystal meth was present in the garage of his house.  The CS verified at approximately 6:30 - 6:38 p.m. that the Defendant had six (6) pounds of crystal meth in the residence. (Tr. 42:19-25, 43:1-25, 44:1-3, 20-24).  In analyzing the other factors, the very nature of a narcotics offense satisfies the gravity standard particularly given the amount of crystal meth involved in this instance.   However, in regard to the issue of a reasonable belief that the subjects were armed, prior to Spec. Agent Kopper and the other agents entering the residence, there was no indication that any of the individuals were armed or that they were endangering the lives of the

officers or neighbors surrounding the residence. The only testimony regarding weapons was that Det. Prince found a weapon in the Defendant's boot at the time of his arrest.

The pivotal analysis in this case, therefore, deals with the issue of exigency.  Exigent circumstances arise when authorities have reason to believe that evidence is in danger of being destroyed or removed." U.S. v. Martinez, 191 Fed. Appx. 856, 859 (11th Cir. 2006) (citing United States v. Mikell, 102 F.3d 470, 475 (11th Cir.1996)).  The Eleventh Circuit has recognized that "the need to invoke the exigent circumstances exception to the warrant requirement is particularly compelling in narcotics cases because narcotics can be so quickly destroyed. Martinez, 191 Fed. Appx. at 859 (quoting United States v. Young, 909 F.2d 442, 446 (11th Cir.1990)). "The mere presence of contraband, however, does not give rise to exigent circumstances."Santa, 236 F. 3d at 669 (quoting Lynch, 934 F.2d at 1232). "The test of whether exigent circumstances exist is an objective one." Santa, 236 F. 3d at 669. '[T]he appropriate inquiry is whether the facts ... would lead a reasonable, experienced agent to believe that evidence might be destroyed before a warrant could be secured.' " Id. (citing Tobin, 923 F.2d at 1510).

In United States v. Santa, a similar raid on a residence occurred without a search warrant. In Santa, the CI began negotiating with the defendants Juan Ramirez and his wife Gloria Santa for the purchase of approximately one (1) kilogram of heroin in August of 1998. Santa, 236 F. 3d at 664. The defendant Ramirez informed the CI they were expecting to receive a kilogram of heroin and they could arrange sale on or about October 4, 1998. Id.  On October 5, 1998, the defendants sold the CI a sample of the heroin at their place of employment, Tony's Furniture Store. Id. at 665.

Then on October 7, 1998, the CI made contact with the defendants and told them he had the kilo of heroin. Id.  The CI, and a DEA agent posing as the money man, met the defendants at the

furniture store at approximately 4:00 p.m., on October 7, 1998. Id.  The parties left the store at approximately 4:25 p.m., with Ramirez and Santa in the front car leading the way to the apartment. Id. The CI and the undercover agent followed Ramirez and Santa in another car, and the supplier, Gallego, left in his vehicle to retrieve the heroin. Id. While en route, the CI and the undercover agent advised the surveilling agents that the group would complete the heroin transaction at Ramirez and Santa's apartment. Id. The DEA had established surveillance at the apartment earlier in the day because both Ramirez and Santa had indicated during previous conversations with the CI that the transaction would take place there. Id.

Ramirez, Santa, the CI, and the undercover agent arrived at the apartment at approximately 4:50 p.m., and the CI followed Ramirez and Santa inside. Id. at 666.  The undercover agent apparently "left the area," although the record is unclear about where he went. Id. The DEA agents had instructed the CI that when he saw the heroin, he was to tell Ramirez and Santa that he was going outside to get the money. Id. As he exited the apartment under that guise, he was to give a prearranged visual signal to the surveilling agents meaning, "I've seen the drugs." Id.

At 6:50 p.m., approximately 15 minutes after hearing from the CI that the supplier was close by, the surveilling agents observed Gallego arrive at the apartment complex. He emerged from his vehicle carrying a white plastic shopping bag. Id. Agents then saw Ramirez exit the apartment, but lost sight of him for a short time. Id. When agents spotted Ramirez again, he was carrying a white plastic bag similar to the one the supplier had been carrying. Id. Ramirez brought the bag into his apartment, according to one of the surveilling agents, "as covertly as possible." Id. The CI followed Ramirez into the apartment, and then emerged three (3) to five (5) minutes later giving the

prearranged signal to the DEA agents indicating that he had seen the heroin. Id.  The supplier had already left the area in his truck, never having entered the apartment. Id.

Within thirty seconds of seeing the CI's signal, two (2) DEA agents-LeClair and Mokwa-and Detective O'Hara of the Hollywood, Florida Police Department approached Ramirez and Santa's first floor apartment. Id. The agents announced themselves at the front door by yelling "police," and found the door locked when they attempted to open it. Id. They then kicked in the front door, and the agents entered with their guns drawn. Id.

After entering the apartment, the agents saw Ramirez in the hallway and ordered him to the floor. Id.  Santa was in the bathroom bathing their two children. Id. The agents advised Ramirez of his Miranda rights and then told him they knew there were drugs in the apartment. Id.  Ramirez told the agents they could search the apartment and that the heroin was under the sink in the master bedroom. Id.  The original protective sweep conducted while Ramirez was still on the floor did not uncover the heroin. Id.  Ramirez was placed under formal arrest after the kilo of heroin was discovered. Id.

After finding the heroin precisely where Ramirez said it would be, the agents led Ramirez to a table in his living room/dining room area. Id. at 667.  They removed his handcuffs and asked him to sign a consent form written in Spanish. Id. Essentially, the agents were asking Ramirez to give his written consent to the search that had just taken place. Id. Ramirez read the consent form silently and signed it. Id.  According to the DEA agents' testimony at the suppression hearing, a total of five (5) to 10 minutes passed between the initial police entry and Ramirez' signing of the consent form. Id.

Ramirez and Santa filed motions to suppress the heroin seized during the search of the Miami Lakes apartment, alleging that the agents' warrantless entry was unlawful and that the subsequent consent given by Ramirez was invalid. Id. In response, the Government contended that exigent circumstances-namely, a possibility that Ramirez or Santa would flee or destroy the drugs-supported their warrantless entry and search of the apartment. Id. The Government contended in the alternative that even if the entry were illegal, Ramirez' subsequent verbal and written consent to search was voluntary and therefore valid. Id.  The Eleventh Circuit held that no exigent circumstances existed that would justify the warrantless entry into the residence in Santa.

In the instant case, Spec. Agt. Kopper  was originally notified that the drugs were leaving Atlanta and headed to Fort Myers  around 11:00 p.m., on July 24, 2008. (Tr. 27:22-25).  Although the original meeting was to have taken place the next morning, he was later advised it would take place around noontime.  (Tr. 28:17-21).  At approximately 1:00 p.m. on July 25, 2008, Spec. Agt. Kopper and Task Force Officer Kelly Witt ("TFO Witt") established surveillance on the City of Palms Automotive Dealership. At approximately 2:40 p.m., the CS advised that the location of the deal was not satisfactory and they would be looking for another location with a garage. (Tr. 30:3-16, 32:25).  When the CS arrived at the dealership at approximately 3:23 p.m., the Defendant suggested using the garage at his residence located in Fort Myers Shores and provided the CS with directions. (Tr. 31:23-24, 33:1-2). Spec. Agt. Kopper drove by the residence to look at it and then to establish surveillance in an area off SR 80.  (Tr. 74:23-25).  They arrived at the Defendant's residence at approximately 4:25 p.m. left and appeared to be conducting counter-surveillance until they returned to the residence sometime between 4:45 and 5:00 p.m.. (Tr. 35:6-10, 36:13-19, 78:17-18).  At

approximately 5:30 p.m., the CS called to advise Spec. Agt. Kopper that the vehicle was in the garage and supposedly the drugs were in the vehicle. (Tr. 41:8-14).

In regard to the issue of exigency, there was no evidence presented to demonstrate that the Defendants were aware of police presence. There is no evidence that surveillance had been discovered by the Defendants, or that the Defendants were planning on fleeing or destroying the narcotics. The facts establish that although Spec. Agt. Kopper suspected that surveillance may have been detected at 4:25 p.m., when the gold Jeep arrived at the Defendant's residence, that after they appeared to do counter-surveillance they returned to the residence between 4:45 p.m., and 5:00 p.m.. (Tr. 35:9-10, 36:11-19). Further, at the time the officers stormed the residence, the CS, Arias Garcia, Xavier Medina San Toyo, and Arturo Perez Medina, a/k/a Chavo were standing in front of the residence. (Tr. 47:9-24). Presumably, they were waiting for the money van. It wasn't until the officers arrived that people ran from the rear of the residence. (Tr. 48:2-10). Eventually, at least two individuals and the Defendant were apprehended in adjacent yards. (Tr. 48: 2-25, 49:1-11).

There were approximately eight (8) to 12 officers who were involved in securing the area. (Tr. 46:14-22). They knew there were approximately six (6) or seven (7) people at the residence at the time of the transaction. (Tr. 47:3-8). Here, the exigent circumstances appeared to have been caused by the agents themselves as they approached the residence. The exigency exception only applies when the "inevitable delay incident to obtaining a warrant must give way to an urgent need for immediate action." Santa, 236 F.3d at 669. It is clear from the case law in the Eleventh Circuit that agents cannot create their own exigent circumstances. Santa, 236 F.3d at 662; Tobin, 923 F.2d at 1510. Therefore, the Defendants fleeing at the sight of a dozen police officers is not sufficient to

justify the warrantless search.  The court has held that "a warrantless search is illegal when police possess probable cause but instead of obtaining a warrant create exigent circumstances."  <u>Santa</u>, 236 F.3d at 669 (citing <u>Tobin</u>, 923 F.2d at 1511).

The inquiry in the instant case now focuses on whether Spec. Agt. Kopper could have obtained an anticipatory warrant to search Flores' residence on July 25, 2008.  Anticipatory search warrants, i.e., warrants that become effective upon the happening of a future event, "have repeatedly been upheld where they are supported by probable cause and the conditions precedent to the search are clearly set forth in the warrant or supporting affidavit."  <u>Santa</u>,236 F.3d at 671(citing <u>U.S. v. Loy</u>, 191 F.3d 360, 364 (3d Cir. 1999) ( citing <u>U.S. v. Hugoboom</u>, 112 F.3d 1081, 1085 (10th Cir. 1997) (collecting cases)).  Anticipatory search warrants have been described as "differ[ing] from traditional warrants in that they are not supported by probable cause to believe the items to be seized are at the place to be searched when the warrant is issued."  <u>Santa</u>,236 F.3d at 672 (citing <u>Loy</u>, 191 F.3d at 364).  It may seem that such warrants would violate the Fourth Amendment's probable cause requirement.  The case law in the Eleventh Circuit demands that "probable cause must exist when the magistrate judge issues the search warrant."  <u>Santa</u>,236 F.3d at 672 (citing <u>U.S. v. Harris</u>, 20 F.3d 445, 450 (11th Cir. 1994)).  However, this statement does not undermine the legality of anticipatory search warrants, when properly issued and supported by probable cause. <u>Santa</u>,236 F.3d at 672.  Probable cause to believe that the contraband is at the location to be searched exists when the contraband arrives there.  <u>Id.</u>  If it does not arrive within the parameters set forth in the warrant, the warrant does not "mature," and no search can lawfully be made. <u>Id.</u> n. 2.  The fact that the narcotics may not be located at the place to be searched in the warrant is immaterial, as long as there is

-20-

probable cause to believe the contraband will be present when the search warrant is executed. Id. at 672.

In general, the fact that a warrant is "anticipatory" i.e., that it takes effect, not upon issuance, but at a specified future time does not invalidate a warrant or make it somehow suspect or legally disfavored. Id.  The use of a "triggering event" can help assure that the search takes place only when justified by "probable cause"; and anticipatory warrants may thereby offer greater, not lesser, protection against unreasonable invasion of a citizen's privacy. Id. at 673.  Thus, the Eleventh Circuit has held that "[a]nticipatory search warrants are not *per se* unconstitutional. Id. In the proper circumstances such warrants will better serve the objective of the Fourth Amendment by allowing law enforcement agents to obtain a warrant in advance of delivery, rather than forcing them to go to the scene without a warrant and decide for themselves, subject to second-guessing by judicial authorities whether the facts justify a search.  Id. (citing U.S. v. Garcia, 882 F.2d 699, 703 (2d Cir. 1989)).

If so, there is no argument that lack of time to obtain a search warrant once the drugs were delivered necessitated a warrantless entry.  If that is the case, the agents should not have waited that long.  Even though the crystal meth had not yet been seen, an anticipatory search warrant could have easily been obtained in the time available.    Spec.Agt. Kopper had previously obtained an anticipatory search warrant and a search warrant involving the same Defendants.  In fact, during the course of the investigation, Spec. Agt. Kopper had prepared at least 10 draft affidavits for search warrants and had continued to update information as it came to him.  (Tr. 83: 2-5, 13-17).  Spec. Agt. Kopper admits during cross examination, "[o]f course, there's the option of getting an anticipatory

search warrant, but at that point, its — what was it five, six o'clock in the evening...". (Tr. 2, 90:19-22).    An anticipatory search warrant would have been proper in this case because there was a sufficient nexus between the contraband to be seized, the six (6) pounds of crystal meth, and the Defendant's residence. *See* Santa, 236 F.3d at 672 (holding that like all warrants there must be a sufficient nexus between the contraband to be seized and the place to be searched).  The fact that the contraband was not presently seen by the CS at the residence is immaterial, so long as there is probable cause to believe that it would be there when the search warrant was executed after the CS informed Spec. Agt. Kopper the drugs were present. Id. (citing Garcia, 882 F.2d at 702).

Although the Government states that there was not sufficient time to obtain a search warrant, Spec. Agt. Kopper had known since 11:00 p.m., on the day before the search that drugs were allegedly in route to Fort Myers from Atlanta. (Tr. 27:22-25; 28:1-7, 29:8-14).  Spec. Agt. Kopper knew when the drugs allegedly arrived in Fort Myers around 1:00 p.m., on July 25, 2008. (Tr. 28:25, 29:1-7).  He knew the drugs were allegedly transported to the Defendant's Residence around 4:30 p.m., to 5:30 p.m. (Tr. 36:15-19).  Somewhere around 5:30 p.m., the CS called to advise Spec. Agt. Kopper that the vehicle was in the garage and supposedly the drugs were in the vehicle.  (Tr. 41:8-14).  Had Spec. Agt. Kopper petitioned the Court for an anticipatory search warrant at 4:30 p.m., or at 5:30 p.m., he would have had sufficient time to obtain the anticipatory warrant by the time the CS called around 6:38 p.m., and notified him that he had seen the drugs.  Spec. Agt. Kopper had the affidavit for the search warrant drafted, or almost fully drafted, on his laptop computer.  Even barring time to travel to the courthouse and stand before a judge, Spec. Agt. Kopper could have e-mailed the warrant to the Judge and/or called the warrant in via the telephone. *See* Santa, 236 F.3d at 676

(holding that in the age of telephonic warrants it would not be impossible or even difficult to obtain a warrant by telephone and therefore, lack of time to obtain a warrant is not a sufficient exigent circumstance under these conditions).

The Government argues that any delay in the delivery of the money would have made the Defendants suspicious and they would have fled with the drugs or increased the danger to the law enforcement officers and, therefore, the agents had to take immediate action. The agents were watching the residence, and there is no indication that the narcotics were in immediate danger of being removed from the residence or destroyed. Even if the Defendants were expecting the money van to appear within a few minutes, the Court cannot speculate what they would have done had the van not arrived promptly. The speculation does not justify the warrantless entry in this instance. The surveillance of the residence had not been compromised and if someone had attempted to leave the scene with the crystal meth, they could have been immediately arrested. Id. at 676 n. 20 (holding that had the defendants sought to flee the apartment they could have been immediately arrested since no warrant would have been necessary to effect the arrest because there was probable cause that a crime was being committed).

Here, just as in the Santa case, there is no reason why Spec. Agt Kopper could not have obtained an anticipatory search warrant from a magistrate judge with the information he possessed. Once the CS informed Spec. Agt. Kopper that he had seen the drugs, the anticipatory warrant would have been triggered and the agents could have moved on the residence without violating the Fourth Amendment. Thus, it is respectfully recommended that the Motion to Suppress the six (6) pounds of crystal meth should be granted.

Although the Court has respectfully recommended that no exigent circumstances supported the agents' warrantless entry into Flores' residence, this does not end the inquiry.  "It is a 'well-settled that one of the specifically established exceptions to the requirements of both a warrant and probable cause is a search conducted pursuant to consent.'" Id. at 676 (citing U.S. v. Freyre-Lazaro, 3 F.3d 1496, 1500-01 (11th Cir. 1993) (quoting Schneckloth v. Bustamonte, 412 U.S. 218, 219, 93 S. Ct. 2041, 2043-2044, 36 L. Ed. 2d 854 (1973)).  Therefore, this Court must determine whether Fores' consent to search the residence was valid notwithstanding the illegal entry into the residence.

### (2) Whether Flores Consent to Search the Residence was Voluntarily Given

It is well settled that one of the specifically established exceptions to the warrant requirement is a search conducted pursuant to consent. Santa, 236 F.3d at 677 (citing Freyre-Lazaro, F.3d at 1500-1501).  The Defendant argues that his voluntary consent offered after the search and seizure of the six (6) pounds of crystal meth must be suppressed because it was tainted by the warrantless search. For consent given after an illegal seizure to be valid, the Government must prove two things: that the consent is voluntary, and that the consent was not a product of the illegal seizure. Santa, 236 F.3d at 676 (citing U.S. v. Robinson, 625 F.2d 1211, 1219 (5th Cir.1980)). Thus, the voluntariness of consent is only a threshold requirement; a voluntary consent to search does not remove the taint of an illegal seizure. Santa, 236 F.3d at 676.  Rather, the second requirement focuses on causation: "[w]hether, granting establishment of the primary illegality, the evidence to which instant objection is made has been come at by exploitation of that illegality or instead by means sufficiently distinguishable to be purged of the primary taint." Id. at 676-677 (citing Wong Sun v. U. S., 371 U.S. 471, 488, 83 S. Ct. 407, 417, 9 L. Ed.2d 441 (1963) (internal quotation omitted)).

Under <u>Wong Sun</u>, the question of whether or not consent is the product of free will must be answered on the facts of each case; no single fact is dispositive. <u>Santa</u>, 236 F.3d at 677 (citing <u>Brown v. Illinois</u>, 422 U.S. 590, 603, 95 S.Ct. 2254, 2261, 45 L.Ed.2d 416 (1975)). Three factors to be considered in determining whether a voluntary consent was obtained by exploitation of an illegal seizure are: the temporal proximity of the seizure and the consent, the presence of intervening circumstances, and, particularly, the purpose and flagrancy of the official misconduct. <u>Santa</u>, 236 F.3d at 677 (citing <u>Brown</u>, 422 U.S. at 603) (applying factors to a confession given after an illegal arrest); <u>Dunaway v. New York</u>, 442 U.S. 200, 218, 99 S.Ct. 2248, 2259, 60 L.Ed.2d 824 (1979) (same); <u>United States v. Valdez</u>, 931 F.2d 1448, 1452 (11th Cir.1991) (applying factors to consent given following an illegal traffic stop). The proper inquiry then is not whether the Defendant was overborne by the agent's illegal entry, but also whether his consent to search was a product of that illegal search. <u>Santa</u>, 236 F.3d at 677.

In <u>Santa</u>, after finding the heroin at Ramirez' residence, the agents led Ramirez to a table in his living room/dining room area. <u>Id.</u> at 667. They removed his handcuffs and asked him to sign a consent form written in Spanish. <u>Id.</u> Essentially, the agents were asking Ramirez to give his written consent to the search that had just taken place. <u>Id.</u>

In this case, after the crystal meth was found in the bed of the silver pick-up truck, Spec. Agt. Kopper made contact with the Defendant. (Tr. 53:24-25, 54:1). He asked him if he was the owner of the residence. (Tr. 54:3-6). The Defendant indicated that he was. (Tr. 54:3-6). Spec. Agt. Kopper asked him if he had anything that he could show him that could prove that. (Tr. 54:6-8). The Defendant took him into the house, through the garage to the kitchen and opened a kitchen drawer.

(Tr. 54:8-12).  The Defendant showed Spec. Agt. Kopper mail that had his name on it. (Tr. 54:8-12).

At that time, Spec. Agt. Kopper  asked the Defendant for consent to search the residence. (Tr. 54:

20-24).  The Defendant said, "go ahead and search." (Tr. 54: 20-24).  He provided the Defendant

with a consent to search form and asked him whether he would prefer it in English or Spanish. (Tr.

54:25, 55:1-7).  The Defendant indicated Spanish. (Tr. 55:7-8).  The Defendant read over the form

and signed it in Spec. Agt. Kopper's  presence at 7:15 p.m. (Tr. 56:13-19, 59:4-6).

Applying the Wong Sun factors to the instant case, it is clear that the Defendant Flores

consent, even if voluntary, was tainted by the illegal search.  The proper inquiry at this point

becomes  whether  Flores' consent was a "product" of the illegal entry.  "The Government may

defeat a motion to suppress by demonstrating a break in the causal chain... [I]ntervening events or

circumstances independent of the primary illegality may have so attenuated the causal connection

as to dissipate the taint of unlawful police action...." Santa, 236 F.3d at 678 (quoting U.S. v. Bailey,

691 F.2d 1009, 1013 (11th Cir. 1982)).  While a "but for" connection between the unlawful police

conduct and the defendant's response will not in itself establish the requisite causal link, neither will

an act by a defendant, which may in some sense be considered "voluntary," necessarily break the

causal chain. Santa, 236 F.3d at 678.

In the instant case, Flores' consent was given less than 30 minutes after the agents made their

initial raid into the residence, after Spec. Agt. Kopper had viewed  the crystal meth in the truck bed,

and while all the officers and agents were still on the scene. The fact that the agents had already

made the discovery and had completed a search of the house made any subsequent consent tainted

by the search. See Santa, 236 F.3d at 677( holding even assuming that the Defendant's consent was

voluntarily, the consent was nonetheless a product of an unlawful arrest and was not purged of the primary taint of the illegal entry and arrest).  Even assuming that Flores' consent was voluntary, this Court respectfully recommends that the consent was the product of the unlawful search. Specifically, there was not a significant lapse of time nor an intervening circumstance which could be argued to dissipate the effect of the illegality.  Therefore, it is respectfully recommended that the Motion to Suppress the voluntary consent to search should be granted.

### (3) Whether the Defendant's Statements Should be Suppressed

The Defendant argues that both his pre-Miranda statements made at his residence and his post-Miranda statements made at FMPD should be suppressed.   The Government responds that the pre-Miranda statements made at the Defendant's residence were mere routine questions not subject to Miranda. Regarding statements made at FMPD, the Government argues the Defendant was properly read and waived his Miranda rights.

Miranda v. Arizona, requires that before a defendant in custody can be interrogated that the Defendant be informed of: (1) the Defendant's right to remain silent; (2) that statements can and will be used against them in a court of law; (3) that the Defendant has the right to an attorney during questioning; and (4) that if the Defendant cannot afford an attorney one will be appointed. 384 U.S. 436, 478-479, 86 S. Ct. 1602, 16 L. Ed. 694 (1966).  Under Miranda, custody is the depravation of freedom of action normally associated with an arrest. Id. at 444.  The initial determination of custody depends on the objective circumstances of interrogation and not on the subjective views harbored by either the officer or the Defendant. Stansbury v. California, 511 U.S. 318, 323 (1994) (*per*

*curiam)*. A person detained pursuant to a routine traffic stop is not ordinarily considered in custody. Berkemer v. McCarty, 468 U.S. 420, 441, 104 S. Ct. 3138, 82 L. Ed. 2d 317 (1984).

The Supreme Court defined interrogation as "express questioning or words and actions on the part of the police . . . that the police should know are reasonably likely to elicit an incriminating response from the suspect. Rhode Island v. Innis, 446 U.S. 291, 300-301, 100 S. Ct. 1682, 64 L. Ed. 297 (1980). Some types of questions are not considered interrogations and therefore do not require Miranda warnings.

While the Supreme Court has said that the Fifth Amendment prohibits an officer from interrogating an arrestee without reading that arrestee his so-called Miranda rights, the rule extends only to the functional equivalent of an interrogation. U.S. v. McKenzie,132 Fed. Appx. 788, 789-790 (11th Cir. 2005) (*citing* Innis, 446 U.S. 299). But, voluntary statements-even those made without a Miranda reading-are admissible as long as they are given freely and voluntarily made without compelling influences. Id. at 299-300; Miranda, 86 S.Ct. at 478.

### (a) Pre-Miranda Statements at the Defendant's Residence

While at the residence, Spec. Agt. Kopper  made contact with the Defendant and asked him if he was the owner of the residence.  (Tr. 53: 24-25, 54:1-6).  The Defendant indicated that he was. (Tr. 54:3-6).  Spec. Agt. Kopper asked the Defendant if he had anything that he could show him that could prove that. (Tr. 54:6-8).  The Defendant took Spec. Agt. Kopper into the house, through the garage to the kitchen, opened a kitchen drawer, and showed him mail that had his name on it. (Tr. 54:8-12).

The Government asserts that the questions were routine questions regarding where the Defendant resided.  Courts have held that routine questions about a person's identity and natural origin were not interrogations for Miranda purposes. Ozuna, 170 F.3d at 657-659.  However, when the questions rise to the level that an individual incriminates themselves by their responses, the Courts have found that Miranda is violated. Gonzalez-Sandoval, 894 F.2d at 1046-1047 (holding that an interrogation occurred where border agents had reason to believe that a person was entering the country illegally and therefore would incriminate themselves with their answers).

In Gonzalez-Sandoval, the Defendant was arrested on state burglary charges on February 1, 1987. Id. at 1046.  After serving two years in state prison he was released. Id.  On October 4, 1988, Gonzalez-Sandoval appeared at a local police station to provide a urine sample as part of the conditions of his parole. Id.  While there, one of the officers asked him if he had ever been deported. Id.  Gonzalez-Sandoval replied that he was deported but that he was now legally back in the United States. Id.  Another officer accused Gonzalez-Sandoval of being illegally in the United States and arrested him. Id.  The officers subsequently checked his status with the Border Patrol who later interview Gonzalez-Sandoval in Calexico jail cell. Id.  The Border Patrol Agent asked Gonzalez-Sandoval where he was born and whether or not he had documents verifying his legal entry back into the United States. Id.  The Border Patrol ran a check on Gonzalez-Sandoval and discovered that he had never received proper permission to return to the United States. Id.  Gonzalez-Sandoval was then read his Miranda rights. Id.

On appeal, Gonzalez-Sandoval argued the pre-Miranda questioning about his immigration status violated his Miranda rights and the answers and information obtained derivatively through

them should have been suppressed. Id.   The Distirct Court denied the Defendant's Motion to Suppress.   On appeal, the Gonzalez-Sandoval, Court overturned the District Court denial of the Motion to Suppress the statements.   The Gonzalez-Sandoval Court noted that "not every question posed in a custodial setting is equivalent to interrogation." Id. (citing United States v. Booth, 669 F. 2d 1231, 1237 (9th Cir. 1981).   However, the Court continued "[c]ustodial questioning constitutes interrogation whenever, under all the circumstances involved in a given case, the questions are reasonably likely to elicit an incriminating response from the suspect."Gonzalez-Sandoval, 894 F.2d at 1046.   The Court found the statements elicited from Gonzalez-Sandoval by the Border Patrol Agents were used to prove the charges of illegal entry and being a deported alien found in the United States. Id. at 1247.

In the instant case, Spec. Agt. Kopper had already entered the residence and discovered the crystal meth in the bed of the silver pick-up truck.   The question, "Is this your residence?", could be seen as a simple routine question regarding who owns the residence or where the Defendant lived. However, in this instance, it appears to fall under the Gonzalez-Sandoval prohibition because at the time the question was asked, Spec. Agt. Kipper had just located six (6) pounds of crystal meth at the residence.   Not only did he ask him about ownership of the residence, but also further asked the Defendant to implicate himself by showing proof.   The Defendant's comments regarding ownership and his subsequent production of letters with his name and address on them clearly implicate him in the drug bust.   Therefore, it is respectfully recommended the Defendant's pre-Miranda statements regarding his place of residence should be suppressed.

### *(b) Post Miranda Statements at Fort Myers' Police Headquarters*

After his arrest, the Defendant was taken to FMPD.  His interview was conducted at approximately 2:15 a.m. (Tr. 105:17-21).  This interview took place at the FMPD after the scene had been secured and searched, the defendants had been processed, and the other individuals had been interviewed one by one. (Tr. 105:1-7).  After the Defendant was brought into an interview room at FMPD, Spec. Agt. Kopper explained the case against him. (Tr. 107:20-25).  He indicated to the Defendant that they had been watching him for a very long time, that they would prefer his cooperation, and they would bring that cooperation to the attention of the courts. (Tr. 107:20-25, 108:1-2).

The Defendant was advised of his Miranda rights and was supplied with DEA Form 13 which is a waiver of rights form. (Tr. 66:9-18; 108:1-5).  The form was provided to him in Spanish. (Tr. 67:4-9).  He read and reviewed it, Det. Arturo Gonzalez reviewed each line with him,  made sure he understood, and he initialed each line. (Tr. 67:10-16).  The Defendant signed the form in Spec. Agt. Kopper's presence. (Tr. 67:17-20).  At no time did the Defendant indicate that he did not wish to speak with them or that he wanted an attorney present. (Tr. 70:24-25, 110:4-9).

The issuen is whether or not the Defendant's statements were tainted by the illegal search and seizure at his residence.  The Government argues that the Defendant was read his Miranda rights and freely and voluntarily agreed to make incriminating statements to the police.  However,  Miranda warnings do not without more dissipate the taint of an illegal seizure. Santa, 236 F.3d at 677 (citing U.S. v. Robinson 624 F.2d 1211, 1220 (11th Cir. 1980)).  The Supreme Court has made it "absolutely clear that, in order for a confession given after an illegal search to be admissible in

-31-

evidence, the government must prove two things: that the confession was voluntary for the purposes of the Fifth Amendment, and that the confession was not the product of the illegal seizure. Id. The same three factors to be considered in determining whether a voluntary consent was obtained by exploitation of an illegal seizure are applied to incriminating statements, specifically, the temporal proximity of the seizure and the consent, the presence of intervening circumstances, and, particularly, the purpose and flagrancy of the official misconduct. Id. (citing Brown, 422 U.S. at 603).

In this instance, the interview occurred some hours after the illegal search and seizure, however, the process was one continuous chain of events without any break in time or events. There were no intervening circumstances sufficient to dissipate the taint of the illegal search and seizure even though the Defendant was read his Miranda rights. Given the proximity to the illegal search and seizure, and the continued chain of events, the Defendant's statements should be considered tainted. Therefore, applying the factors announced in Wong Sun v. United States, and Brown v. Illinois it is respectfully recommended that the Defendant's incriminating statements should be suppressed as tainted by the illegal search of the Defendant's residence.

Accordingly, it is now

**RESPECTFULLY RECOMMENDED:**

The Motion to Suppress Evidence and Statements of Defendant (Doc. #65) should be **GRANTED.**

Failure to file written objections to the proposed findings and recommendations contained in this report within ten (10) days from the date of its filing shall bar an aggrieved party from attacking the factual findings on appeal.

**Respectfully Recommended** at Fort Myers, Florida, this __8th__ day of December, 2008.

SHERI POLSTER CHAPPELL
UNITED STATES MAGISTRATE JUDGE

Copies: All Parties of Record